IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONOVAN HALL and ROGER
REUBEN, JR.,

                Plaintiffs,

     v.

SERGEANT DAN MCGHEE, in his
individual capacity, CHARLES DIX,
in his individual capacity, AARON
JACKSON, in his individual
capacity, RAY HUNT, in his
individual capacity, and JOHN
DOES 1-4, in their individual
capacities as deputies of the DeKalb
County Sheriff's Office,

                Defendants.

                                   1:15-cv-428-WSD

## OPINION AND ORDER

This matter is before the Court on Defendants Charles Dix, Ray Hunt, Aaron Jackson, and Dan McGhee's (collectively, "Defendants") Motion for Summary Judgment [46].

I.    **BACKGROUND**

A.    Facts

On June 12, 2013, Judge Clarence F. Seeliger of the DeKalb Superior Court issued a contempt order regarding Natania Griffin, the mother of Plaintiffs

Donovan Hall and Roger Reuben, Jr. ("Plaintiffs").  (Defs.' Statement of Material Facts [46.2] ("DSMF") ¶ 1; Pl.'s Resp. [56.1] ("R-DSMF") ¶ 1; [50.1] at 2).  The order stated that, because Ms. Griffin failed to pay $1,000 in guardian *ad litem* fees as previously ordered by the court, the court found her in contempt.  Judge Seeliger ordered Ms. Griffin to purge her contempt by paying $1,000 to the DeKalb County Sheriff within 30 days.  The order further stated that, if Ms. Griffin failed to pay the $1,000 within 30 days, the DeKalb County Sheriff is ordered to incarcerate her in the DeKalb County jail until the $1,000 is paid in full.  ([50.1] at 2).  The order was received by the DeKalb County Sheriff on June 19, 2013.  (Id.).  An arrest order information sheet provided a physical description of Ms. Griffin and her address:  4563 Carissa Court, Ellenwood, GA 30294.  ([50.2]).

On the night of July 25, 2013, Investigator Harold Sean Williams and Investigator Aaron retrieved Ms. Griffin's arrest warrant.  (See DSMF ¶¶ 6-8; R-DSMF ¶¶ 6-8).  At the time, Investigator Williams was training Deputy Niyema Smith on how to execute warrants.  (DSMF ¶ 9; R-DSMF ¶ 9).  Investigator Williams, Investigator Jackson, and Deputy Smith arrived at Ms. Griffin's address around 1:13 a.m.  (DSMF ¶¶ 13-14; R-DSMF ¶¶ 13-14).  The officers ran the tag on the car in the driveway, and learned that it was registered to Plaintiff Roger Reuben and Ms. Griffin.  (DSMF ¶ 16; R-DSMF ¶ 16).   Following standard

protocol, Investigator Jackson went to the rear of the house to ensure that no one ran out of the back, and Investigator Williams and Deputy Smith went to the front of the house.  (DSMF ¶ 15; R-DSMF ¶ 15).

When Investigator Williams and Deputy Smith got to the front door, they first determined whether they could see any movement or hear any noises in the house.  (DSMF ¶ 17; R-DSMF ¶ 17).  After determining there was no movement or noise, Deputy Smith knocked on the door, while Investigator Williams took a step back and watched inside the house through a large window above the front door.  (DSMF ¶ 19; R-DSMF ¶ 19).  After Deputy Smith knocked, Investigator Williams claims he saw Ms. Griffin crawling on the floor at the top of the stairs.  (DSMF ¶ 20).  Ms. Williams denies that she would ever crawl on a floor.  (Griffin Dep. [66] at 38:19-22).  Investigator Williams shined his flashlight inside the house to let the occupant know that he could see them.  (DSMF ¶ 21; R-DSMF ¶ 21).  He then announced "DeKalb County Sheriff's Office."  (DSMF ¶ 22; R-DSMF ¶ 22; Williams Dep. [64] at 32:25-33:3; 35:23-36:3).[1]  Defendants contend that Ms. Griffin ignored Investigator Williams and continued crawling on

---

[1]     Defendants contend Investigator Williams asked Ms. Griffin to come to the door, but the deposition testimony Defendants rely upon does not support this assertion.  (See Williams Dep. at 32:25-33:3; 35:23-36:3).

the floor.  (DSMF ¶ 23).  Deputy Smith and Investigator Williams were persistent in trying to get the occupants of the house to respond to their request to respond to them at the door.  They did so by knocking on the door, progressively harder, at various intervals then ringing the doorbell, and stating that the occupants needed to come to the door.  (See Video [72]).  Eventually, Ms. Griffin and one of the Plaintiffs came downstairs.  (Id.).  Deputy Smith contends that, when Ms. Griffin asked why they were there, she held the contempt order up to the window. Plaintiffs contend Deputy Smith only said "you're going to open the door, and then I'll tell you what's going on."  (DSMF ¶ 24; R-DSMF ¶ 24; Hall Dep. at 22). Plaintiffs told Defendants that they had the wrong address, and Plaintiffs claimed they were afraid of Defendants because Defendants were acting aggressively.  (See Video).

Plaintiff Hall claims this aggressive, loud behavior prohibited him from asking the officers why they were at the house.  Plaintiff Hall used his phone to videotape the confrontation.  The video shows extended periods during which

Plaintiffs, including Plaintiff Hall, could have spoken to the officers either from the stairs or at the door.  (See Video).[2]

Shortly thereafter, Investigator Jackson radioed Investigator Williams and Deputy Smith to tell them that he saw movement through uncovered windows at the back of the house.  (DSMF ¶ 25; R-DSMF ¶ 25).  Investigator Jackson indicated that someone was crawling on the floor, and that he could see people passing something back and forth.  (DSMF ¶ 26; R-DSMF ¶ 26; Jackson Dep. [42.7] at 35).  Other officers were able to hear these radio communications. (DSMF ¶ 27; R-DSMF ¶ 27).  Deputy Dix and Deputy Hunt, who were executing warrants nearby, came to the scene in response to Investigator Jackson's radio communications.  (DSMF ¶ 29; R-DSMF ¶ 29).  Sgt. McGhee, the supervisor on duty that night, also overheard the radio traffic and came to the scene to assist. (DSMF ¶ 30; R-DSMF ¶ 30).

Once the additional officers were on the scene, Sgt. McGhee tried to convince Plaintiffs and Ms. Griffin to open the door.  (DSMF ¶ 31; McGhee Dep. [61] at 81:14-82:5).  Plaintiffs claim Sgt. McGhee and the other officers were

---

[2]     Someone close to Plaintiff Hall while he was on the phone to 911 whispered suggestions of things for him to say like the officers were at the "wrong address" and "tell them this is harassment."

"extremely aggressive," and that they were yelling, cursing at, and threatening[3] them.  (R-DSMF ¶ 31; Hall Dep. [68] at 31:16-20).  Deputy Dix recalls Ms. Griffin coming to the door and indicating that she knew why the officers were there, and that Ms. Griffin stated that she did not have the $1,000 to pay for child support. (DSMF ¶ 32).  Plaintiffs dispute that Ms. Griffin ever came to the door.  (R-DSMF ¶ 32).  The video shows her at the door when it was opened for the deputies.[4]

One of the officers told the occupants of the house to call 911 to verify that the officers were in fact law enforcement officials.  (DSMF ¶ 33; R-DSMF ¶ 33). Plaintiff Hall called 911, and was instructed several times by the 911 operator to open the door because the individuals outside were law enforcement officers. (DSMF ¶ 34; R-DSMF ¶ 34).  Plaintiff Hall requested that a "captain" come to the house, and, at some point, one of the officers on the scene activated the blue lights on a marked police car to show the occupants that they were law enforcement officers.  (DSMF ¶¶ 35-36; R-DSMF ¶¶ 35-36).

---

[3]    The video produced by the Plaintiffs show the officers had to yell because the door was closed and Plaintiffs were at the top of the hallway stairs.  On the produced video, there are no examples of cursing or threats made by the officers toward the Plaintiffs during this time.

[4]    The video shows a statement made by Ms. Griffin when on the stairs with Plaintiff Hall in which she states:  " . . . you want me to give money to [expletive] DFCS to give it to the other side?"  (See Video).  The warrant sought to be served was for failure to pay expenses for a guardian *ad litem*.  The statement did not appear to have been spoken loud enough for the officers outside the house to hear.

Having been at the scene for 20-35 minutes, Defendants and other on-scene officers began to grow concerned about their safety because of Plaintiffs' and Ms. Griffin's noncompliant and odd behavior.  (DSMF ¶ 38).  Defendants feared that the occupants could possibly have a weapon or were committing a crime, and believed that the occupants were committing the offense of obstruction by refusing to open the door.  (DSMF ¶¶ 40, 41).

At some point, a neighbor came and asked if he could assist.  (DSMF ¶ 42; R-DSMF ¶ 42).  The officers allowed the neighbor to talk to Plaintiffs and Ms. Griffin through the door.  (DSMF ¶ 43; R-DSMF ¶ 43).  Soon after the neighbor spoke to Plaintiffs and Ms. Griffin, the door opened and Defendants and the other on-scene officers quickly entered the house.  (DSMF ¶ 44; R-DSMF ¶ 44).[5]  Ms. Griffin was arrested and placed in the sheriff's car.  (See DSMF ¶ 45; R-DSMF ¶ 45).

When the door was opened, there was a heated exchange between Plaintiffs and the officers.  The officers told the Plaintiffs to get on the ground.  (See Video).  Defendants claim that Plaintiffs refused to comply with their orders.  (DSMF ¶ 46).  Plaintiffs contend the officers rushed in through the door and forced them to the

---

[5]     Moments before the door opened and while Ms. Griffin was at the door, she made statements about the officers, stating that she "rebukes Satan back to hell from whence he came."  (See Video).

ground.  (R-DSMF ¶ 46).  Defendants claim that Plaintiffs were noncompliant and passively resisted, which resulted in them being handcuffed.  (DSMF ¶ 50).  Plaintiffs contend they did not resist any attempts by Defendants to detain or arrest them.  (Pl.'s Statement of Additional Facts [56.1] ("PSAF") ¶¶ 1-2).[6]  At some point, Investigator Jackson brandished his Taser, and threatened to tase Plaintiffs if they said anything else or did not remain quiet.  (DSMF ¶ 52; R-DSMF ¶ 52; Smith Dep. at 61-64 ("I remember him saying . . . to be quiet, you know, or calm down, I'm going to tase you, keep talking, you know.")).  Plaintiffs claim that Sgt. McGhee and other Defendants grabbed Plaintiff Hall's arms and, when both of his arms were restrained, Sgt. McGhee hit Hall in the face with his gun.  (PSAF ¶ 3; Hall Dep. at 67:1-10).  Hall contends Sgt. McGhee stood on Hall's head with both feet.  (PSAF ¶ 3; Hall Dep. 72:18-37:10).  Defendants dispute that Sgt. McGhee pistol-whipped Plaintiff Hall or stood on Hall's head during the incident.  (DSMF ¶ 57).  Plaintiff Reuben claims that one of the Defendants picked him up and body slammed him on the floor.  Once he was on the floor, Investigator Jackson allegedly pressed his Taser against the back of Reuben's neck, and said that if he moved his hands, he would tase him.  (PSAF ¶ 5; Reuben Dep. at

---

[6]     The video appears to show Plaintiff Hall trying to persuade his family members to stop their yelling and otherwise to calm them down and do what the police officers instructed.  (See Video).

36:14-37:18).  Plaintiff Hall saw multiple officers on top of Reuben punching and kicking him, and he states that one of the officers was spitting and cursing, "saying I'm going to . . . tase the shit out of your big ass."  (Hall Dep. at 68:7-14).  The video of the officers' entry into the house does not show spitting and there were no sounds consistent with spitting.  (See Video).

While Plaintiffs were detained, the officers conducted a security sweep of the house.  (DSMF ¶¶ 47, 49; R-DSMF ¶¶ 47, 49).  The parties disagree whether the detention of Plaintiffs was temporary for purposes of the sweep or whether the officers indicated Plaintiffs were being arrested and taken to jail.  (See id.).  After Plaintiffs were handcuffed, they were placed on the couch.  The videoed discussion after Plaintiffs were handcuffed was less heated and ultimately Plaintiffs were un-cuffed.  During this discussion, which lasted approximately fifteen minutes, there was no mention of any of Plaintiffs being hit, stood upon or spit upon.  (See Video).  Plaintiffs claim that, while they were on the couch, Investigator Jackson moved back and forth between them, pointing his Taser at them and pressing it against their heads.  (PSAF ¶ 6; Def.'s Resp. [60] ¶ 6; Hall Dep. at 69:8-15).[7] When the officers discovered that neither Plaintiff had an outstanding warrant, the

---

[7]     At one point, Plaintiff Hall stated "you are arresting us because we are black."  The officer to whom this was directed stated "I'm black . . . ."  (See Video).

officers decided not to arrest them for obstruction.  Plaintiffs were un-handcuffed and Defendants left.  (DSMF ¶¶ 54, 58; R-DSMF ¶ 54, 58).  Plaintiffs claim they were in handcuffs for about an hour.  (McKnight Aff. [56.4] ¶ 12).  The CAD Report of the Defendants' radio traffic indicates that the first officers on the scene arrived at 1:13 a.m., and the last officer left the scene at 2:48 a.m.  (DSMF ¶¶ 68, 69; R-DSMF ¶¶ 68, 69).

On the afternoon of July 26, 2013, a few hours after the incident, Plaintiff Hall and Ms. Griffin visited DeKalb Medical Center ("DMC") as a result of Plaintiff Hall's alleged injuries.  (DSMF ¶ 59; R-DSMF ¶ 59).  Medical records indicate that Plaintiff Hall had no visible injuries.  (DSMF ¶ 59).[8]  Plaintiff Hall claims he suffered pain in his face, back and legs.  (PSAF ¶ 7; Hall Dep. at 99:11-16; 105:10-17).  Plaintiff Reuben claims he suffered physical pain to his back and head, that his asthma was aggravated by Defendants' actions, and that he has trouble sleeping at night because of the incident.  (PSAF ¶ 8; Reuben Dep. at 61, 67, 71, 77)

After Plaintiffs filed a citizen's complaint, the incident was investigated by the DeKalb County Sheriff's Office, and it was determined that Defendants had

---

[8]     Plaintiff's hearsay objection to this assertion is overruled, because the medical records relied upon fall under the business records exception.  See Fed. R. Evid. 803(6).

violated the Neglect of Duty policy for failure to give suitable attention to the performance of their duties.  (DSMF ¶ 70; R-DSMF ¶ 70).  Investigator Jackson was reprimanded for the "inappropriate use of force towards persons in [his] custody," and for omitting key facts from his report.  (Brown Dep. [69] at 45:19-46:20).

B.     Procedural History

On February 12, 2015, Plaintiffs filed their Complaint [1], asserting the following claims:  (1) excessive force in violation of the Fourth Amendment, brought under 42 U.S.C. § 1983 ("Section 1983") against Defendants in their individual capacities; (2) false imprisonment under O.C.G.A. § 51-7-20; (3) assault and battery; (4) intentional infliction of emotional distress; (5) attorneys fees pursuant to 42 U.S.C. § 1988; and (6) punitive damages.

On April 29, 2016, Defendants filed their Motion for Summary Judgment. Defendants argue they are entitled to qualified immunity on Plaintiff's Section 1983 claim.  Defendants claim they are entitled to official immunity against Plaintiff's state law claims against them, and that Plaintiffs' state law claims fail as a matter of law.

## II.    DISCUSSION

### A.    Legal Standard

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56.  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment.  Id.

"[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246.  The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

In the context of the qualified immunity analysis, "at the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [the officers'] actions . . . is a pure question of law." Penley v. Eslinger, 605 F.3d 843, 849 (alterations omitted) (quoting Scott, 550 U.S. at 381 n.8).

B.   Analysis

Defendants argue they are entitled to qualified immunity on Plaintiff's

Section 1983 claim.[9]  Defendants claim they are entitled to official immunity

against Plaintiff's state law claims against them, and that Plaintiffs' state law

claims fail as a matter of law.

     1.   Federal Claim

Section 1983 "provides a cause of action against '[e]very person who, under

color of any statute of any State . . . subjects, or causes to be subjected, any

citizen . . . to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws" of the United States.  Wyatt v. Cole, 504 U.S. 158, 161

(1992) (alterations in original) (quoting 42 U.S.C. § 1983).  Qualified immunity

"offers complete protection for government officials sued in their individual

capacities if their conduct 'does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'"

Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow

v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The purpose of this immunity is to

---

[9]     Defendants claim they are entitled to Eleventh Amendment immunity
against Plaintiffs' claims against them in their official capacities.  Because
"defendants have been sued only in their individual capacities[,]" (Resp. [56]; see
also Compl.), the Court does not address whether Defendants are entitled to
Eleventh Amendment immunity.

14

allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation . . . ."  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

To be entitled to qualified immunity, a government official "bears the initial burden of showing he was acting within his discretionary authority." Valderrama v. Rousseau, 780 F.3d 1108, 1112 (11th Cir. 2015) (internal quotation marks omitted).  Defendants argue, and Plaintiff does not appear to contest, that Defendants were engaged in a discretionary function when they encountered Plaintiffs on July 26, 2013.  "[D]iscretionary authority [ ] include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority."  Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994).  The Court must "assess whether [the acts] are of a type that fell within the employee's job responsibilities."  Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).  "[T]he inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act."  Id. at 1266.  The Court agrees that the acts Defendants undertook were of the type that fell within their job responsibilities, and find that Defendants were engaged in a discretionary function.  The burden thus shifts to Plaintiffs to show that "(1) the defendant[s]

violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."  Id. at 1264.

Plaintiffs argue that Defendants used excessive force when Defendants allegedly pistol-whipped Hall, stood on Hall's head, and body-slammed, kicked and punched Reuben, thus violating Plaintiffs' Fourth Amendment right to be free from unreasonable seizure.  See Penley, 605 F.3d at 849.  "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'"  Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  The level of force applied must not exceed that which a reasonable officer would believe is necessary in the situation at hand.  Id. (quoting Mercado v. City of Orlando, 407 F.3d 1152 (11th Cir. 2005).  However, "even de minimus force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect."  Reese v. Herbert, 527 F.3d 1253, 1272 (11th Cir. 2008) (internal quotation marks omitted).  "We begin our inquiry, therefore, with the question of whether [Defendants] had probable cause or arguable probable cause to arrest [Plaintiffs,]" or whether they had a right to detain them to conduct an investigatory stop.  Id.

a)    <u>Whether Defendants Had Arguable Probable Cause to Arrest</u>

The parties disagree whether Defendants had probable cause to arrest Plaintiffs.  Even assuming, for the moment, that Defendants' detention of Plaintiffs constituted an arrest or ultimately ripened into an arrest, the Court finds Defendants had arguable probable cause to arrest them.

"[A]n arrest without probable cause violates the Fourth Amendment."  <u>Lowe v. Aldridge</u>, 958 F.2d 1565, 1570 (11th Cir. 1992).  Probable cause exists if "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  <u>Von Stein v. Brescher</u>, 904 F.2d 572, 578 (11th Cir. 1990) (citations and footnote omitted).  The appropriate inquiry under the "violated clearly established law" prong of qualified immunity, however, "is not whether there was probable cause, but whether there was 'arguable' probable cause to arrest."  <u>See</u> <u>Pickens</u>, 59 F.3d at 1206.  Arguable probable cause is evaluated by determining whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest."  <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1195 (11th Cir. 2002) (alteration in original) (quoting <u>Scarbrough v. Myles</u>, 245 F.3d 1299, 1302

(11th Cir. 2001)); see also Jones v. Cannon, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999) ("[W]hat counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later.").

In examining arguable probable cause, a court considers the elements of the crime charged and the operative fact pattern. See Skop v. City of Atlanta, 485 F.3d 1130, 1137-38 (11th Cir. 2007). Arguable probable cause does not exist if it is "clear that the conduct in question does not rise to the level of a crime, under the facts known at the time." Wilkerson v. Seymour, 736 F.3d 974, 978 (11th Cir. 2013). This is an objective standard, and the officer's subjective intent, beliefs, or inferences are not part of the inquiry. Rushing v. Parker, 599 F.3d 1263, 1266 (11th Cir. 2010).

Under Georgia law, "[e]xcept as otherwise provided in [O.C.G.A. § 16-10-24(b)], a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor." O.C.G.A. § 16-10-24(a). At the time of the arrest, Defendants knew at least the following facts: (1) officers had a warrant for Ms. Griffin's arrest; (2) the car in the driveway of the residence was registered to Ms. Griffin;

18

(3) officers demanded multiple times that Plaintiffs and Ms. Griffin open the door; (4) after calling 911, the 911 operator told Plaintiffs several times to open the door; (5) officers had confirmed that they were law enforcement officers by turning on the blue lights on a marked vehicle; (6) officers had been on the scene for approximately thirty minutes; (7) officers had reported seeing individuals inside the house crawling on the floor and passing something back and forth.  Under these facts, the Court finds reasonable officers under the same circumstances and possessing the same knowledge as Defendants could have believed that probable cause existed to arrest Plaintiffs for obstructing them in the lawful discharge of their official duties.

The Court also finds that, even if Defendants' detention of Plaintiffs ultimately ripened into an arrest, the initial purpose of the detention was to conduct a brief investigation.  The Fourth Amendment permits an officer "to conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "Reasonable suspicion is a less demanding standard than probable cause, but requires 'at least a minimal level of objective justification for making the stop.'" United States v. Franklin, 323 F.3d 1298, 1301 (quoting Wardlow, 528 U.S. at 123).  Courts "must look at the totality of the circumstances of each case to see

whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).

Here, that officers saw individuals crawling on the ground and passing something back and forth, in combination with Plaintiffs' refusal to comply with the officers, provided a reasonable, articulable suspicion that criminal activity was afoot.  Specifically, the officers could have suspected that Plaintiffs possessed, among other contraband, controlled substances, in violation of O.C.G.A. § 16-13-30, or illegal weapons, in violation of O.C.G.A. § 16-11-122 or § 16-11-123.  (See DSMF ¶¶ 40, 41 (stating that Defendants feared Plaintiffs may have had a weapon or were committing some other crime)).[10]  The officers also could have suspected that an effort was being made to hide Ms. Griffin and thus obstruct the exercise of their duties to execute the warrant, in violation of O.C.G.A. § 16-10-24(a).  After Defendants were allowed into the house and moved to arrest

---

[10]    That Plaintiffs were immediately handcuffed does not, by itself, transform the detention into an "arrest" in the constitutional sense.  See United States v. Blackman, 66 F.3d 1572, 1576 ("[T]he fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest.").

Ms. Williams, Plaintiffs were detained and the officers conducted a security sweep of the house.  (DSMF ¶¶ 47, 49; R-DSMF ¶¶ 47, 49).

Having determined that (1) Defendants had reasonable suspicion to detain Plaintiffs and that, (2) even if the detention ripened into an arrest, Defendants had arguable probable cause to arrest Plaintiffs, the Court next determines whether the force used in effectuating the detention or arrest was objectively reasonable.

b)   Whether the Force Used was Objectively Reasonable

The Eleventh Circuit analyzes a claim of excessive force under the Fourth Amendment's "objective reasonableness" standard.  Salvato v. Miley, 790 F.3d 1286, 1293 (11th Cir. 2015).  In determining whether the use of force was "objectively reasonable," a court is required to carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests[ ] against the countervailing governmental interests at stake under the facts of the particular case."  Id. (internal quotation marks omitted).  "To satisfy the objective reasonableness standard imposed by the Fourth Amendment, [Defendants] must establish that the countervailing government interest was great."  Id. at 850. "[A]nalysis of this balancing test is governed by (1) the severity of the crime at issue; (2) whether [Plaintiffs] posed an immediate threat to [Defendants] or others; and (3) whether [Plaintiffs] actively resisted arrest."  Id. at 850-51.  "A mechanical

application of these factors, however, is not appropriate.  Instead, we must be careful to evaluate the reasonableness of an officer's conduct on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. (internal quotation marks and citations omitted).

Taking the evidence in the light most favorable to Plaintiffs to the extent supported by the record, these factors lead to the conclusion that Defendants did not violate Plaintiffs' Fourth Amendment rights by using an objectively unreasonable amount of force.  Regarding the first factor, which looks to the severity of the crime at issue, "[t]he crime of misdemeanor obstruction is a crime of 'minor severity' for which less force is generally appropriate."  Reese, 527 F.3d at 1274.  As noted above, however, Defendants saw individuals inside the house crawling on the floor and passing something back and forth.  Plaintiffs and Ms. Griffin refused to open the door for approximately thirty minutes, even after Defendants and a 911 operator repeatedly instructed them to do so, and after Defendants showed Plaintiffs they were law officers by activating the blue lights on a marked unit.  For approximately thirty minutes, Defendants restrained themselves from forcing entry, trying to get the Plaintiffs and Ms. Griffin to open the door to the house by knocking, then pounding, on the door, then ringing the door bell after being ignored, and after telling told Plaintiffs to call 911 for

22

verification that they were law enforcement officers.  Only when a neighbor asked to help did Plaintiffs open the door and when they did they resisted Defendants and verbally accosted them.  Plaintiffs' noncompliant and odd behavior, coupled with Defendants' sightings of individuals crawling on the floor and passing something back and forth, such furtive movement provided Defendants reasonable suspicion that Plaintiffs were in possession of narcotics, weapons, other contraband, or were seeking to obstruct the apprehension of Ms. Griffin.  The first factor weighs in favor of Defendants.

The second factor—whether Plaintiffs posed an immediate threat—also weighs in favor of Defendants.  Plaintiffs' and Ms. Griffin's noncompliant and odd behavior, coupled with Defendants' sightings of individuals crawling on the floor and passing something back and forth, would lead a reasonable officer under the circumstances to believe Plaintiffs posed an immediate threat to them.  In addition, Hall testified at his deposition that he did not comply with the officers' instruction to get on the ground.  He testified that, when the officers entered the house, they told him to get on the ground, and that "all I could say was stop, stop, stop, stop, stop, stop, stop.  And then it just escalated from there[,]" resulting in the officers "push[ing him] down on the ground."  (Hall Dep. at 70:22-71:20).  The video of the occurrence appears to confirm Hall's account of the events.  (See Video [72]).

Reuben testified that, when the officers entered the house, he and Hall "split up" and "retreat[ed]" from the entrance, with Reuben heading to the kitchen and Hall into the living room. (Reuben Dep. at 35:9-22). The fact of Hall's failure to comply with the officers' requests and Plaintiffs' splitting up and retreating to separate rooms, taken together with Plaintiffs' resistance to opening the door and the officers' reasonable suspicion of criminal activity, would have contributed to a reasonable officer's perception that Hall and Reuben posed a threat or were attempting to flee.

The third factor—whether Plaintiffs actively resisted arrest—also tilts towards Defendants, albeit more weakly. The parties contest whether Defendants actively resisted arrest. As described above, however, Hall testified that he did not comply with requests to get on the ground, resulting in him being forced to the ground, and Reuben testified that both he and Hall retreated into separate rooms when the officers entered. Reuben also testified that, while he was on the ground, an officer "kept telling [him] to move [his] hands from under [him]," but that, because the officer "had his knee in [Reuben's] back[,]" Reuben "physically couldn't move [his] hands, because they were stuck under [him] with the way [he] landed once [he] was body-slammed." (Reuben Dep. 37:18-23). A reasonable

officer, not knowing that Reuben's hands were pinned under his body during this active encounter, could have believed Reuben was purposefully resisting arrest.

Turning to the amount of force used, the Court notes that the alleged pistol-whipping, standing on Hall's head, body-slamming, kicking, and punching all took place during Defendants' attempts to restrain Plaintiffs, and before Plaintiffs were handcuffed. (See Hall Dep. at 66-73). At this time, as discussed above, Defendants had reasonable suspicion of criminal activity, including that Plaintiffs may have been in possession of weapons. Though the Court is troubled by allegations that Defendants pistol-whipped Hall and stood on his head, medical records from several hours after the incident—enough time for swelling to be visible—indicate that if Hall was treated as he claimed, the force used was not enough to cause visible injuries, (see DSMF ¶ 59), and Reuben does not claim to have sought any medical attention for his alleged injuries, supporting that the amount of force used was minimal. That Investigator Jackson pressed his Taser against Plaintiffs' heads, but did not activate it, after they were handcuffed, while also troubling, involves a minor, non-injury-producing use of force. Cf. Lloyd v. Van Tassell, 318 F. App'x 755, 758-59 (11th Cir. 2009) (reversing summary judgment for officer where plaintiff presented evidence he was compliant and not resisting when officer applied sufficient force to break plaintiff's nose).

The Court finds that the balance of these factors weighs in favor of
Defendants.  Viewing the facts in the light most favorable to Plaintiffs,
Defendants' use of force, while containing troubling elements, was not, under the
circumstances of this particular case, objectively unreasonable.  The Court thus
finds that Defendants are entitled to qualified immunity on Plaintiffs' Section 1983
claim against them.[11], [12]

### 2.   State-Law Claims

Plaintiffs' sole federal claim having been dismissed, the Court considers
whether to exercise supplemental jurisdiction over Plaintiff's remaining state law
claims.  Where "no basis for original federal jurisdiction presently exists, the
district court has the discretion to decline to exercise supplemental jurisdiction."
Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., 402 F.3d 1092, 1123
(11th Cir. 2005) (citing 28 U.S.C. § 1367(c)); see also Rowe v. City of Fort
Lauderdale, 279 F.3d 1271, 1288 (11th Cir. 2002) (whether to continue to exercise

---

[11]   Because the Court finds that the force used was not objectively
unreasonable, the Court rejects Plaintiffs' arguments that (1) Defendants had a
duty to intervene to stop the allegedly excessive force and that (2) Sgt. McGhee is
liable as a supervisor for the allegedly excessive forced used by his subordinates.

[12]   Because Plaintiffs' Section 1983 claim fails, their request for attorneys' fees
under 42 U.S.C. §1988 also fails, because Plaintiffs are not a "prevailing party"
under Section 1988.  See 42 U.S.C. § 1988 ("the court, in its discretion, may allow
the prevailing party . . . a reasonable attorney's fee as part of the costs" in a Section
1983 action).

supplemental jurisdiction is a decision that "should be and is vested in the sound discretion of the district court").  Here, Plaintiffs' sole federal claim has been dismissed, the parties are not diverse, and the Court does not have any basis, other than supplemental jurisdiction, to exercise jurisdiction over Plaintiffs' state-law claims.[13]  The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.  Accordingly, Plaintiffs' state-law claims are dismissed without prejudice.[14]

---

[13]     Plaintiffs allege, without any detail, that the Court has jurisdiction pursuant to 28 U.S.C. § 1343 ("Section 1343").  (Compl. ¶ 2).  It appears the only provision in Section 1343 relevant to this action is subsection (a)(3), which provides that "[t]he district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . [t]o redress the deprivation, under color any State law, statute ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States[.]"  28 U.S.C. § 1343(a)(3).  The Supreme Court has long recognized that Section 1343(a)(3) "is the jurisdictional counterpart of" Section 1983.  Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 615 (1979).  Plaintiffs' Section 1983 claim having been dismissed, Section 1343(a)(3) does not provide an independent basis for the Court to exercise jurisdiction.

[14]     Plaintiffs' Complaint also names as defendants John Does 1-4 (the "John Doe Defendants").  Fictitious party pleading is not permitted in federal court, unless the plaintiffs' description of the fictitious defendants is so specific as to be, at the very worst, surplusage.  Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010).  Plaintiff has not provided any evidence regarding the identities or actions of the John Doe Defendants, and the John Doe Defendants are required to be dismissed from this action.

### III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [46] is **GRANTED**.  Plaintiffs' federal claims under Section 1983 and Section 1988 are **DISMISSED WITH PREJUDICE**.  Plaintiff's state-law claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants John Does 1-4 are **DISMISSED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

**SO ORDERED** this 30th day of January, 2017.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE